IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| IN RE:<br><br>CITIZENS CORPORATION and<br>FINANCIAL DATA TECHNOLOY<br>CORPORATION,<br><br>    Debtors,<br><br>v.<br>DAVID S. MEYERS,<br><br>    Appellant,<br><br><br>GARY M. MURPHY, Trustee,<br><br>    Appellee. | Case No. 3:13-cv-1140<br>Chief Judge Haynes |

# MEMORANDUM

This action is an appeal of the Order of the Honorable Marian F. Harrison, Bankruptcy Judge, granting the Trustee's motion to disallow the claims of David Myers against Financial Data Technology Corporation ("FDT") and Citizens Corporation ("Citizens"), FDT's corporate parent. This action arose after Citizens filed its voluntary Chapter 11 petition. After his appointment, Gary Murphy, the Chapter 11 Trustee, filed an action against FDT in the Chancery Court for Williamson County, Tennessee, seeking exoneration of the loan and reimbursement of the interest paid thereon, but the Chancery Court stayed these proceedings after the Trustee filed a voluntary Chapter 11 on FDT's behalf. By Order of the Bankruptcy Judge, the Chapter 11 Trustee assumed the duties as FDT's debtor-in-possession in its Chapter 11 proceedings. Citizens's and FDT's Chapter 11 actions

1

were consolidated and on September 14, 2012, the Bankruptcy Court approved the sale of substantially all of FDT's assets to FiServ. On February 1, 2013, FDT filed a disclosure statement and plan of liquidation that the Bankruptcy Court initially approved on March 19, 2013, and confirmed on May 17, 2013.

Myers filed timely claims against Citizens and FDT, seeking repayment of his pledged CDs in the amount of $750,000, as well as all interest paid on the loan to Infinite Capital Strategies, Inc. ("ICS"), a parent corporation of Citizens. The Chapter 11 Trustee objected and after the parties filed memoranda, the Bankruptcy Judge entered her findings and conclusions.

From a review of the parties' briefs, the underlying facts in this action are undisputed. Set forth below are Judge Harrison's findings of fact that this Court adopts[1]:

> Citizens was founded by Marion "Ed" Lowery (hereinafter "Mr. Lowery") in July 1985 as a holding company for banks it purchased. In the fall of 1993, Citizens sold all of its bank holdings and signed a long-term agreement with the First City Bank of Murfreesboro to furnish data processing services. Fi-Data was formed that same year as a wholly-owned subsidiary of Citizens to provide those services. Fi-Data offered its banking customers the FiServ Premier suite of products which included core account processing, item processing, internet banking, and other products. Fi-Data also served as an internet service provider for its clients. In 1993, Citizens owned 100% of Fi-Data's shares. In fact, Fi-Data is the only operating asset that Citizens owned. Citizens' only other business appears to have been making loans that were participated out to other banks.
>
> In 2003, Mr. Lowery also formed Southern Hospitality, Inc., a Tennessee corporation formerly known as Equipment Services Corp. (hereinafter "ESC"). ESC's purpose was to purchase most of Fi-Data's computer hardware, software, and related property, and the licenses to use this property.
>
> Apart from the sale-and-leaseback transactions with Fi-Data, ESC had no operations

---

[1] Executive Benefits Insurance Agency v. Arkison, __ U.S. __, No. 12-1200, 134 S. Ct. 2156, 2174 (2014) ("The bankruptcy court should hear the proceeding and submit proposed findings of fact and conclusions of law to the district court for de novo review and entry of judgment.").

or source of income. Its only other sources of funds were borrowings or other infusions of cash from affiliates or outside banks. After the formation of ESC, a number of such sale-and-leaseback transactions between Fi-Data and ESC were consummated. To document these transactions, among other things, ESC and Fi-Data entered into leases pursuant to which ESC authorized Fi-Data to use the rights granted to ESC under the agreements with FiServ, along with the computer equipment. Fi-Data made lease payments to ESC pursuant to these various leases. As Fi-Data needed additional computer hardware, software, and related property, it would from time-to-time purchase or license these from various vendors, primarily FiServ. Then at intervals – usually annually – Fi-Data would sell or assign its rights in the newly-acquired property to ESC, and ESC would lease these back to Fi-Data. This practice continued into 2011.

In 2009, Mr. Lowery formed ICS, which is a holding company without employees. Mr. Lowery is the president, CEO, and majority shareholder of ICS. Mr. Lowery transferred to ICS his ownership interest in ESC and Citizens in exchange for a controlling interest in ICS, thus making ICS the parent of both Citizens[2] and ESC.

Mr. Myers, a long-time investment broker, became personally acquainted with Mr. Lowery in the 1990s. In 2002, for the first time, he invested in a Lowery-related company, specifically Commerce Bancshares, Inc. (hereinafter "CBI"). The principal holding of CBI was the Peoples State Bank of Commerce. This investment lasted for less than a year, as CBI or Mr. Lowery repurchased this stock at the amount initially paid, $500,000 in cash. During the period of Mr. Myers' ownership, he received two quarterly dividends totaling $6,550.56.

Since 2002, Mr. Myers has made a number of other purchases of stock in CBI and its affiliate Farmers Bancorp, Inc. (hereinafter "Farmers"). Each of these purchases was solicited by Mr. Lowery, who offered to have Citizens finance 100% of the cost, and who assured Mr. Myers that the future dividends and distributions on the stock would be sufficient to pay the interest coming due on Mr. Myers' debt to Citizens.

In 2005, at the urging of Mr. Lowery, Mr. Myers invested $500,000 in Union Federal, LLC, which had been formed to purchase a Hendersonville, Tennessee, savings and loan company. Later, Mr. Myers agreed to accept 9,900 shares of Class B common stock in Citizens in exchange for his investment in Union Federal, LLC. In January 2009, Mr. Myers acquired 3,479 shares of Citizens' Class A common stock. In June 2009, at the initiative of Citizens, these shares were exchanged for 4,974 shares of Citizens' Class B common stock. In November 2009, Mr. Myers agreed to acquire another 4,975 shares of Citizens' Class B stock at a cost of $575,000.

---

[2] As stated earlier, Citizens is the parent company of FDT, owning 100% of FDT's stock.

Apart from Mr. Myers' initial investments in CBI stock and Union Federal, LLC, all of Mr. Myers' investments in Citizens and CBI were financed through loans from Citizens. The first of these loans was dated May 31, 2003, in the principal amount of $2,887,500 and was originally due in July 2008. Mr. Myers and Mr. Lowery were co-makers of this note. This loan was participated to Nexity Bank, and Mr. Myers deposited with that bank, a $600,000 certificate of deposit. Later in 2003, at Mr. Myers' request, this $600,000 certificate of deposit was applied to reduce his portion of the outstanding loan balance.

Between the time of the initial transaction in May 2003 and November 30, 2009, Mr. Myers was a maker or co-maker on at least six additional promissory notes payable to Citizens of various amounts. The balance of the original May 2003 promissory note and several of the other promissory notes were ultimately consolidated into a single note executed by Mr. Myers on November 30, 2009, in the principal amount of $5,875,000. Unknown to Mr. Myers at the time, Citizens sold participations in the loan totaling $5,875,000 to Tennessee Commerce Bank (hereinafter "TCB") and North Alabama Bank. In August 2011, Citizens conveyed to TCB all its remaining rights, title, and interests in and to this note, which remains unpaid.

At the time of Citizens' Chapter 11 filing, Mr. Myers continued to own 19,849 shares of the Class B common stock of Citizens. This amounted to 10.4% of the total of Citizens' outstanding shares at the time. Other minority shareholders of Citizens held 9.5%, and ICS owned the remaining 80.1%. Beginning with Mr. Myers' initial investment in CBI until March 2011, Mr. Lowery told Mr. Myers on various occasions that the value of his stock in CBI, Farmers, and Citizens was worth more than the amount owed on the loans that he had taken from Citizens.

As a result of his investments in Citizens and CBI, Mr. Myers received dividends totaling in excess of $775,000 before February 1, 2008. Except for a 2010 dividend/interest check-swapping transaction,[3] Mr. Myers received no dividend or distribution from Citizens, CBI, or Farmers after February 1, 2008. During the previous years, Mr. Myers made all interest payments coming due on notes to Citizens he had signed in connection with his acquisition of stock in Citizens or CBI,

---

[3] In December 2010, Mr. Lowery represented to Mr. Myers that Citizens would be unable to make the interest payment on Mr. Myers' note as previously promised. Mr. Myers, along with the other shareholders of Citizens who had executed similar notes, were presented with dividend checks for calendar year 2010, drawn upon Citizens' account at TCB. Mr. Myers' dividend check dated November 1, 2010, totaled $158,792. Although this check was dated November 1, 2010, Mr. Myers did not receive the check until December 30 when it was delivered to him by Mr. Lowery. At the time, Mr. Myers gave Mr. Lowery a check dated December 30, 2010, payable to Citizens in the amount of $170,294.52, which Mr. Lowery represented was the amount of the interest installment that had come due November 1, 2010, on the Note.

with the exception of a few instances in which accrued interest on one note was rolled into the principal amount of a new note.

In 2007 and 2008, Citizens obtained loans in the aggregate of $33.25 million from TCB, secured by Citizens' stock in Fi-Data. As a condition for these loans, Citizens was prohibited from borrowing funds on behalf of Fi-Data, or otherwise encumbering Fi-Data's assets, without TCB's permission. Mr. Lowery originally planned for the dividends of CBI and Farmers, as well as the revenues of Fi-Data, to satisfy the debt service obligations on these notes. However, as the financial market continued its downward spiral in 2008, Fi-Data was thrust into the position of having to service all of Citizens' debt, in addition to its own operations.

For many years, Fi-Data maintained general ledger accounts reflecting the intercompany transactions among it, Citizens, ESC, ICS, and other of the Lowery-controlled entities. Over the years, Fi-Data's operations generated substantial cash flow, and significant portions of this cash flow were transferred to Citizens, ESC, and ICS. Starting in late 2009 or early 2010, Mr. Lowery insisted that more and more cash be transferred out of Fi-Data to Citizens and other Lowery-controlled entities. During this period, Fi-Data's obligations to its parent and affiliates, as opposed to its own business activities, increasingly strained Fi-Data's ability to meet its own obligations. Although Fi-Data netted over $1 million in both 2009 and 2010, it began to experience significant cash flow problems. In the calendar year 2010 alone, Fi-Data transferred several million dollars to Citizens, and ended 2010 with an outstanding receivable from Citizens of $2,500,840.94.

Between September 29, 2010, and January 10, 2011, FiServ issued invoices to Fi-Data and ESC with an aggregate payable of $432,250.34. FiServ's invoices typically have 90-day payment terms. The largest invoice was for $332,059.47, dated November 5, 2010. Neither Fi-Data nor ESC paid these invoices upon receipt, nor did either pay the largest invoice within 90 days. Between November 12 and November 15, 2010, Fi-Data transferred to Citizens a total of $363,000, which funds would have been more than enough to pay the largest FiServ invoice.

As of December 31, 2009, the general ledger for the intercompany account between Citizens and Fi-Data reflected a payable from Fi-Data to Citizens in the amount of $832,620.59. By December 31, 2010, the general ledger reflected a receivable owed by Citizens to Fi-Data in the amount of $2,500,840.94. As a part of these transfers, Fi-Data transferred to Citizens a net amount of $1,225,181.29 from October 1, 2010, through December 31, 2010. Again, this amount would have been sufficient to pay the amounts owed to FiServ.

By letter dated February 23, 2011, FiServ threatened to terminate ESC's and Fi-Data's licenses (or sub-licenses) to use FiServ's software, unless Fi-Data or ESC

satisfied certain past-due invoices totaling more than $400,000 by March 18, 2011.

In March 2011, Mr. Lowery requested that Tennessee Bank & Trust (hereinafter "TB&T") loan ICS $1,100,000. TB&T would make the loan only if it were fully collateralized, so Mr. Lowery contacted Mr. Myers and asked him to provide collateral for the loan. Mr. Myers agreed to pledge two CDs with total value of $750,000 as collateral for the TB&T loan, and Mr. Lowery pledged his personal CD valued at $350,000. When Mr. Myers realized that the borrower on the loan was ICS rather than Fi-Data, he excused himself and called Mr. Lowery. Mr. Lowery told Mr. Myers that the loan was needed immediately and that loaning the money directly to Citizens or Fi-Data would take too much time. Mr. Lowery also assured Mr. Myers that his stock in Citizens, CBI, and Farmers was worth more than $9.4 million.

After this conversation, Mr. Myers signed the documents, pledging his $750,000 in CDs for the loan to ICS. Mr. Myers testified that he agreed to pledge the CDs as a favor to Mr. Lowery and did not expect to be compensated. There are no written documents connecting Mr. Myers' pledge of the CDs for the March 2, 2011, loan to ICS with Fi-Data or Citizens.

That same date, TB&T issued its check made payable to ICS in the amount of $1,100,000. Mr. Lowery endorsed this check as president of ICS, for deposit to the TB&T account of Fi-Data. ICS, Citizens, and ESC did not maintain bank accounts at TB&T. Fi-Data's account manager, Andrea Martin (hereinafter "Ms. Martin"), recorded this transaction as a credit to Fi-Data's general ledger account, an asset account wherein all transactions in the TB&T checking account were recorded. Ms. Martin also recorded the transaction to Fi-Data's liability account wherein intercompany payables to ICS were recorded. With this transaction, the balance of Fi-Data's recorded payable to ICS was $1,100,000. At the same time, another general ledger receivable account reflected that Fi-Data was owed $112,800 by ICS.

The $1,100,000 was rapidly disbursed by Fi-Data. Approximately $417,000 was paid to FiServ. Additionally, on the day the funds were deposited, Fi-Data paid $226,750 to ESC and $75,000 to ICS. Fi-Data also used $100,000 to pay down its line of credit with Farmers Bank of Portland and transferred other sums to its operating account with TCB. From the TCB account, Fi-Data paid ICS another $212,000 on March 24, 2012. Also, Fi-Data continued to make transfers to Citizens. On March 14, 2011, Fi-Data transferred $134,000 to Citizens, followed by $35,000 on March 15, and $18,000 on March 16. On March 25, Mr. Lowery also caused Fi-Data to sign a note to TCB in the amount of $975,000, and Fi-Data immediately transferred the proceeds of this loan to Citizens. Between March 29 and April 1, 2011, Fi-Data transferred an additional $147,350 to Citizens.

Mr. Lowery wanted his $350,000 CD pledged to TB&T to be replaced by a CD from

Fi-Data. To accomplish this, in early June 2011, Fi-Data borrowed in excess of $141,800 via loans secured by automobiles owned by Fi-Data. These loan proceeds, together with an additional $88,200 provided by the proceeds of a personal loan to Mr. Lowery and $120,000 cash from ICS, were deposited into Fi-Data's account at TB&T. On June 14, 2011, these funds financed Fi-Data's purchase of a $350,000 CD with TB&T, which Fi-Data pledged as collateral for the $1,100,000 ICS loan. In conjunction with this pledge, TB&T released Mr. Lowery's CD on June 14, 2011, while Mr. Myers' CDs, valued at $750,000, remained pledged to TB&T.

The pattern of transfers of Fi-Data cash to Citizens continued through September 2011. Between March 2 and September 13, 2011, Fi-Data transferred a net value of $628,054 to Citizens. During this same period, Citizens transferred a net amount of $342,005 to ICS, with many of these transfers occurring either the same date as transfers from Fi-Data to Citizens or within a few days thereafter. The raiding of Fi-Data's cash for use by Citizens and other Lowery-controlled entities ended only after the Bank Group[4] took control of Fi-Data, and Fi-Data's president, Jean Ramsey (hereinafter "Ms. Ramsey"), refused to make additional cash transfers. After the separation of Fi-Data from the other Lowery-controlled entities, Fi-Data quickly experienced a positive cash flow.

On September 13, 2011, Fi-Data permitted TB&T to apply its CD to the outstanding balance of the loan, leaving $750,000 of outstanding principal secured by Mr. Myers' pledged CDs. On September 13, 2011, December 29, 2011, April 24, 2012, and August 13, 2012, Mr. Myers paid the interest and executed the documents necessary to renew the TB&T loan to ICS. Fi-Data had no involvement with the ICS loan after application of its pledge in September 2011. Mr. Myers paid the interest to keep the notes current so that his CDs would not be applied to the loan. Eventually, Mr. Myers' CDs were applied, and the ICS loan is now paid-in-full.

(Docket Entry No. 1-4, Memorandum, at 2-12).

## Conclusions of Law

Myers asserts claims for unjust enrichment here, a breach of an implied in law contract or quasi-contract. For this claim, Myers must establish "1) '[a] benefit conferred upon the defendant by the plaintiff'; 2) 'appreciation by the defendant of such benefit'; and 3) 'acceptance of such

---

[4] Prior to the bankruptcy filings, TCB sold participations in loans to Citizens to Legends Bank and three other community banks operating in Middle Tennessee. TCB, Legends Bank, and the three other banks holding participations in these loans are referred to collectively as the "Bank Group."

7

benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof.'" Freeman Indus., LLC v. Eastman Chem. Co., 172 S.W.3d 512, 524-525 (Tenn. 2005) (citation omitted). The critical element is proof that the enrichment of the beneficiary is unjust. Bennett v. Visa U.S.A. Inc., 198 S.W.3d 747, 756 (Tenn. Ct. App. 2006) (citation omitted). If the beneficiary "'has given any consideration to any person' for the benefits received from the plaintiff, there is no injustice in allowing the defendant to retain those benefits without paying the plaintiff." Id. (citation omitted). Under Tennessee law, the Statute of Frauds does not preclude the recovery of damages for unjust enrichment. EnGenius Entm't, Inc. v. Herenton, 971 S.W.2d 12, 20 (Tenn. Ct. App. 1997) (citations omitted).

Yet, if Myers and the beneficiary are not in privity under a written contract, then Myers must first exhaust his remedies against the party with whom he enjoyed privity of contract before pursuing a claim against the beneficiary. Freeman Indus., 172 S.W.3d at 525 (citations omitted). The Bankruptcy Judge found that Myers did not have a contract at Citizens and/or FDT. (Docket Entry No. 1-4, at 15). The Chapter 11 Trustee asserts that Myers's claim for this equitable remedy fails because Myers failed to pursue an action against ICS and/or Lowery. The facts, however, establish that recovery from ICS or Lowery is impossible or that the Chapter 11 trustee had little expectation of recovering any funds from ICS or Lowery. Tennessee law does not require Myers to pursue futile remedies. Freeman Indus., 172 S.W.3d at 526 ("to maintain an action for unjust enrichment, a plaintiff is not required to exhaust all remedies against the party with whom the plaintiff is in privity if the pursuit of the remedies would be futile").

As to his pledge of $750,000 in certificates of deposits as collateral for the TB&T loan to ICS, Myers contends that "since the loan proceeds went to [FDT] and [FDT] was intended to be the

beneficiary of the loan," FDT "is in the posture of a primary or principal obligor." The Bankruptcy Judge found that ICS is the obligated entity for the TB&T loan and that at the time of the TB&T loan, ICS was a legitimate corporation. (Docket Entry No. 1-4, at 15-16). To be sure, Myers signed an agreement to pledge his CD deposit for this loan, but neither Citizens nor FDT signed that agreement. The Bankruptcy Judge found that Myers knew that ICS was a separate corporation from Citizens and FDT, its wholly-owned subsidiary, but Myers failed to obtain a written contractual commitment from FDT, Citizens, or ICS. Id. at 16.

Under Tennessee corporations law, corporate entities are presumed distinct from their shareholders, officers, and directors, and corporate formalities are upheld absent special circumstances, including fraud or illegal acts. Pamperin v. Streamline Mfg., Inc., 276 S.W.3d 428, 436-37 (Tenn. Ct. App. 2008). The piercing of the corporate veil of a parent and its subsidiaries is not favored absent proof to satisfy the exceptions. Id. at 437. Yet, Myers seeks to hold FDT liable for benefits from the TB&T loan FDT received solely on unjust enrichment theory.

As to holding FDT liable for ICS's failure to repay the TB&T loan, "[a]s a rule, parent and subsidiary corporations are separate entities, having separate assets and liabilities . . . . The parent's ownership of all of the shares of the subsidiary does not make the subsidiary's assets the parent's . . . . Hence, the parent's creditors have no claim to the subsidiary's assets, and vice versa. A party seeking to overcome the presumption of separateness must pierce the corporate veil, or prove that the two entities should be substantively consolidated." Regency Holdings (Cayman), Inc. v. The Microcap Fund, Inc. (In re Regency Holdings (Cayman), Inc.), 216 B.R. 371, 375 (Bankr. S.D.N.Y. 1998) (internal citations omitted). In sum, the Bankruptcy Judge concluded that under the facts here, Myers' unjust enrichment claim was "an end run around the alter ego doctrine." (Docket Entry No.

1-4, Memorandum, at 17).

As unjust enrichment, "[i]f a third-party defendant 'has given any consideration to any person' for the benefits received from the plaintiff, there is no injustice in allowing the defendant to retain those benefits without paying the plaintiff." Bennett v. Visa U.S.A. Inc., 198 S.W.3d 747, 756 (Tenn. Ct. App. 2006). In Bennett, a consumer filed a class action against Visa and MasterCard, alleging that the credit card companies had unjustly benefitted by requiring merchants who accepted their credit cards to also accept their debit cards. Id. at 751. The Court dismissed the unjust enrichment claim as a matter of law because the credit card companies had agreed to pay the merchants $3.05 billion in settlement agreements resolving the merchants' class action suit. Id. at 756-57. Because the credit card companies had paid consideration to the merchants for the alleged wrong, the Tennessee appellate court held that consumers could not recover under an unjust enrichment theory. Id. at 757.

Here, the Bankruptcy Judge found that FDT was not unjustly enriched because FDT paid far more to Citizens and ICS than the amount of the TB&T loan. "The net amount transferred from [FDT] to Citizens during the year prior to March 3, 2011, totaled $2,620,143.05, including a net of $333,570.30 from January 1, 2011, to March 3, 2011. From October through December of 2010, the period during which FiServ billed the $432,250.34 in invoices that subsequently became the subject of FiServ's demand letter, [FDT] transferred a net amount of $1,225,181.29 to Citizens, including $363,000 between November 12 and November 15, 2010." (Docket Entry No. 1-4, Memorandum, at 18). The Bankruptcy Judge reasoned that these payments greatly exceeded the amount of the TB&T loan proceeds, and if returned, FDT would have had the funds to pay the obligations to FiServ and the other creditors who were paid in March after the TB&T loan proceeds were received. Id.

On the day the TB&T loan proceeds were deposited, FDT returned $75,000 to ICS and $226,000 to ESC, a wholly-owned subsidiary of ICS. On March 24, 2012, FDT transferred another $212,000 to Citizens. In June 2011, FDT pledged a $350,000 CD as collateral for ICS's loan from TB&T. FDT borrowed to generate a significant portion of the funds needed to buy this CD that FDT applied against the TB&T loan upon its maturity in September 2011. Between March 3 and September 13, 2011, FDT transferred a net of $1,603,054.77 to Citizens, $240,250.00 to ESC, and $595,455.71 to ICS, including FDT's pledge of a $350,000.00 CD to TB&T approximately $2.4 million in outgoing cash. Because FDT paid in excess of what monies FDT received from Myers, the Bankruptcy Judge concluded that Myers cannot recover against FDT. Id. at 19; see Paschall's, Inc. v. Dozier, 407 S.W.2d 150, 155 (Tenn. 1966) ("if the landowner has given any consideration to any person for the improvements, it would not be unjust for him to retain the benefit without paying the furnisher"). In a word, the Bankruptcy Judge ruled that to allow Myers' $750,000 claim, FDT would be required to pay twice for the benefit of Meyers' pledged collateral. Id. at 20.

The Bankruptcy Judge also found that Myers had a personal interest in pledging his CDs for the TB&T loan. Id. Myers had investments in Citizens that were dependent upon FDT's value and the cash flow. In a word, FDT's value was inextricably tied to FDT's access to software licensed by ESC from FiServ. Id. at 20-21. In pledging his CDs, the Bankruptcy Judge found that "Myers knew that the value of his investment in the Lowery-controlled entities, especially Citizens, was at stake." Id. at 21. In addition to his CDs, Myers also executed notes payable to Citizens totaling nearly $6 million with the expectation that Citizens would generate sufficient dividends to pay the interest on those loans for which FDT had to continue to generate significant revenues for Citizen's use. Id.

Before Myers pledged his CDs, Myers inquired about the value of his holdings in the

Lowery-controlled entities, and Lowery valued Myers's holdings as approximately $9 million in contrast to the Lowery entities' $5.875 million of debt. Days after Myers pledged his CDs, Lowery confirmed in writing his valuation of Meyers' ownership interest. The Bankruptcy Judge found that "only after receiving this valuation information" did "Myers agree[] to pledge his CDs to ensure that [FDT]'s operations remained active, thereby protecting the value of his investment in Citizens." Id.

Given Myers's self-interest in FDT's continued operations in early 2011, the Bankruptcy Judge found that Myers's pledge of his CD's was to protect his interests as a Citizens shareholder. Id. at 22. The Bankruptcy Judge described the decisions barring recovery in such instances:

> Where no compensation is discussed or agreed upon in advance for services requested by and rendered to another, the presumption that compensation was intended is rebutted by circumstances which negate such an intention. One of such circumstances is a strong self-interest in the outcome of the transaction on the part of the party furnishing the service." Meyering v. Milliman (In re Camfield's Estate), 88 N.W.2d 388, 393 (Mich. 1958). Mr. Myers' ability to accumulate wealth in the form of his investment in Citizens and to avoid out-of-pocket payments on his Citizens' notes was directly tied to Fi-Data's continued operations. In situations "where the services rendered benefitted both parties," a plaintiff is not entitled to "recovery under the quantum meruit doctrine because services performed for the mutual benefit of both parties are ordinarily done without the expectation of payment" when performed. Quadrille Bus. Sys. v. Ky. Cattlemen's Assoc., Inc., 242 S.W.3d 359, 366 (Ky. Ct. App. 2007); see also Peko Oil USA v. Evans, 800 S.W.2d 572, 577 (Tex. Ct. App. 1990) (no recovery under unjust enrichment when services performed for business reasons and without contemplation of direct cash payment); Maple Island Farm, Inc. v. Bitterling, 209 F.2d 867, 871-72 (8th Cir. 1954) (citation omitted) (no recovery under unjust enrichment for preliminary services done in anticipation of obtaining a contract); Dunn v. Phoenix Village, Inc., 213 F. Supp. 936, 954 (W.D. Ark. 1963) (plaintiff's desire to place himself in favorable business position made unjust enrichment claim to recover loan proceeds untenable). Mr. Myers' involvement in the transaction was self-interested, and therefore, there is no basis for allowing his claim against Fi-Data.

Id. at 22-23.

The Bankruptcy Judge also cited Myers's testimony that he pledged his CDs based on

Lowery and without expectation of compensation and that such proof precludes recovery. Id. at 23; Doe v. HCA Health Servs. of Tenn., Inc., 46 S.W.3d 191, 198 (Tenn. 2001) and RESTATEMENT (FIRST) OF RESTITUTION § 1, cmt. c. (1937) (where a party "makes a gift or voluntarily pays money which he knows he does not owe confers a benefit; in neither case is he entitled to restitution."); see also Volumetrics Med. Imaging, Inc. v. ATL Ultrasound, Inc., 243 F. Supp. 2d 386, 412 (M.D.N.C. 2003) (Pledges "intended originally as a gratuity cannot subsequently be turned into a charge").

The Bankruptcy Judge noted that prior to his pledge, Myers did not contact anyone at FDT except Lowery, who did not have an official title with FDT. (Docket Entry No. 1-4, at 24). The Bankruptcy Judge reasoned that such omission can be reasonably viewed as a voluntary transaction without expectation of compensation or relief or unjust enrichment grounds. Id. Myers did not ask Lowery, Citizens, or FDT to provide any security for his pledge, and testified that his pledge at issue was a "personal favor" to Lowery. Id. at 26. The Bankruptcy Judge also found that Myers is a sophisticated investment broker and frequent participant in transactions with Lowery and Lowery-controlled entities, so Myers knew that the real borrower on the TB&T loan was ICS, not Citizens or FDT. Id. at 25.

As to Myers's contention that FDT breached its contract with Myers, or that he could claim indemnification or suretyship, the Bankruptcy Judge found no underlying contract and that "ICS is the entity obligated under the [] loan". Id. at 15. Thus, as a matter of law, those claims fail.

For these reasons, the Bankruptcy Judge's ruling is adopted and affirmed.

13

An appropriate Order is filed herewith.

**ENTERED** this the __8th__ day of July, 2014.

                                       _____
                                       WILLIAM J. HAYNES, JR.
                                       Chief Judge
                                       United States District Court